UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/2/2015
```

------------------------------------------------x
                         :

ANTHONY KEITH COOK,                             :

              Plaintiff,            :           13cv1946 (TPG)

       - against -                            :         **OPINION & ORDER**

CAROLYN W. COLVIN,                              :
ACTING COMMISSIONER
OF SOCIAL SECURITY,                             :

              Defendant.            :

------------------------------------------------x

      On August 14, 2015, Magistrate Judge Ellis issued a Report and Recommendation recommending that plaintiff's motion for judgment on the pleadings be granted in part, and that the action be remanded for further administrative proceedings. Objections to that Report and Recommendation were due 14 days after each party was served with a copy of the Report and Recommendation. Having received no objections and finding Judge Ellis' decision to be correct and appropriate, the court hereby adopts the Report and Recommendation. Plaintiff's motion for judgment on the pleadings is granted in part.

      The action is remanded for further administrative proceedings, consistent with the rationale and recommendation of Judge Ellis. The Clerk of Court is directed to close the case.

SO ORDERED.

Dated:   New York, New York
           September 2, 2015

                                         THOMAS P. GRIESA
                                         U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8-14-15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY KEITH COOK,                       :
                                          :
                        Plaintiff,        :      REPORT AND
                                          :      RECOMMENDATION
            - against -                    :
                                          :      13-CV-1946 (TPG) (RLE)
CAROLYN W. COLVIN,                        :
ACTING COMMISSIONER OF SOCIAL SECURITY :
                                          :
                        Defendant.        :
                                          :

TO THE HONORABLE THOMAS P. GRIESA, U.S.D.J.

## I.   INTRODUCTION

Plaintiff Anthony Cook ("Cook") commenced this action under the Social Security Act

("Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), challenging the final decision of the Commissioner

of Social Security ("Commissioner") denying his claim for Social Security Disability ("SSD")

and Supplemental Security Income ("SSI") benefits for the period after August 6, 2009. (Doc.

No. 1.) The Commissioner found that Cook was disabled from August 1, 2008, through August

5, 2009, but that as of August 6, 2009, Cook had medically improved and was no longer

disabled. (Doc. No. 8 at 63.) Cook was found ineligible for SSD and SSI benefits from August

6, 2009, through April 28, 2011, the date of the Administrative Law Judge's ("ALJ") decision.

(*Id.* at 73.) Cook seeks reversal of the part of the Commissioner's decision finding that he had

medically improved as of August 6, 2009, and was therefore ineligible for benefits after that

date. (Doc. No. 12 at 7.)

On April 1, 2014, Cook filed a motion for judgment on the pleadings. (Doc. No. 11) He

seeks a remand solely for calculation of benefits or, in the alternative, a remand for a new

hearing and decision. (Doc. No. 11; Doc. No. 12 at 17.) Cook argues that the ALJ erred by: (1)

finding Cook medically improved; (2) failing to follow the treating physician rule; (3) failing to

properly evaluate Cook's credibility; and (4) relying on the Medical-Vocational Guidelines ("the

Grids"). (*Id.* at 7, 12, 15.) The Commissioner filed a cross-motion for judgment on the pleadings

on August 6, 2014. (Doc. No. 19.)

　　　　For the reasons that follow, I recommend that Cook's motion be **GRANTED IN PART**

and that the case be **REMANDED** for further administrative proceedings.

## II.　　BACKGROUND

### A.　　Procedural History

　　　　Cook applied for SSD and SSI on July 5, and July 8, 2009, respectively, claiming

disability because of Human Immunodeficiency Virus (HIV) since August 1, 2008. (Doc. No. 8

at 124, 131.) On August 20, 2009, the Social Security Administration denied both applications.

(*Id.* at 78.) On August 25, 2009, Cook requested an administrative hearing. (*Id.* at 86.) On

March 16, 2011, ALJ Robert C. Dorf held an administrative hearing; Cook attended,

accompanied by a non-attorney representative. (*Id.* at 11.) The ALJ issued a partially favorable

decision dated April 28, 2011, finding Cook disabled from August 1, 2008, the date of the onset

of HIV, through August 5, 2009, the date of his consultative exam with Dr. Hamway. (*Id.* at 63.)

The ALJ found, however, that after August 5, 2009, Cook had medically improved and was no

longer disabled. (*Id.*) On May 20, 2011, Cook requested review of the unfavorable portion of

the ALJ's decision. (*Id.* at 52.) The Appeals Council denied Cook's request for review on

September 5, 2012, making the ALJ's decision the Commissioner's final decision. (*Id.* at 5.)

Cook filed this action on March 22, 2013. (Doc. No. 1.)

**B.     ALJ Hearing**

    **1.     Cook's Testimony at the Hearing**

    Anthony Cook was born on February 26, 1972, and was thirty-nine years old at the time of the hearing. (Doc. No. 8 at 15.) Cook resides in Manhattan, New York, with his girlfriend and four children aged sixteen, fifteen, thirteen, and twelve. (*Id.* at 15-16.) After graduating from high school he worked as a licensed security officer and fireguard for at least three different organizations. (*Id.* at 17-19.)

    In 2009, Cook was diagnosed with HIV and began taking anti-retroviral medication twice daily. (Doc. No. 8 at 24, 32.) As a side effect of his medication, he feels "a lot" of fatigue, chronic diarrhea, vomiting, and chest pain and needs to sleep for four to six hours after taking medications. (*Id.* at 32-33, 35-36.) Other side effects of medication include blurry vision and inability to concentrate. (*Id.* at 27-28.) At the time of the hearing, Cook had gained "some weight" and weighed 137 pounds. (*Id.* at 15.) His CD4 count[1] was 200 and his viral load[2] was "under control." (*Id.* at 15-16.)

    Because of his medication-induced fatigue, Cook spends most of his time at home but cannot help his children with their homework assignments. (Doc. No. 8 at 16.) Instead, his children help him do laundry and shopping. (*Id.* at 32.) Moreover, Cook can walk five blocks if he moves slowly and can climb only three flights of stairs without chest pains. (*Id.* at 16, 35.)

    Cook's strength is not "where it used to be." (Doc. No. 8 at 34.) As a result of his condition, he can lift under 10 pounds "on a good day," but not on a bad day. (*Id.* at 23.) When

---

[1] CD4 cells are immune system cells that HIV targets. The CD4 count is a barometer of immune system strength. A CD4 count below 200 puts a person at risk for opportunistic infections. Johns Hopkins Medicine, *Preventing Opportunistic Infections in HIV/AIDS*, Health Library (Aug. 5, 2015), http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/infectious_diseases/preventing_opportunistic_infecti ons_in_hivaids_134,98/.

[2] The term "viral load" refers to the amount of HIV in a sample of blood. When the viral load is high, there is more HIV, and the immune system is not fighting HIV as well. AIDS.gov, *Viral Load* (Aug. 5, 2015), http://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/viral-load/.

Cook was a security officer, he had to stand most of the time and carry more than ten pounds. (*Id.* at 18.)  He worked in security for one month in 2010, but "due to [his]...medical status," he often felt "sick on the job," had to "run to the bathroom" frequently, would "get nauseous," and would "throw up."  (*Id.* at 21.)  Cook feels that the mixture of medications he takes creates stomach complications that would make sedentary work difficult if he did not have access to specific foods.  (*Id.* at 36.)  Otherwise, he would have to run "back and forth" between his post and the bathroom.  (*Id.* at 37.)

### 2.    Medical Evidence

#### a.    Dominick Bioh, M.D.: Treating Physician

Dr. Bioh has been Cook's treating physician since 2002. (Doc. No. 8-2 at 31.)  Cook visits Dr. Bioh every six to eight weeks. (Doc. No. 8-3 at 3.)  By the hearing date, Dr. Bioh had compiled treatment notes and had written letters summarizing Cook's health. (Doc. No. 8-2 at 31; Doc. No. 8-3.)

On August 28, 2008, Cook was experiencing gradual weight loss, general malaise and fatigue, abdominal pain, and variable appetite. (Doc. No. 8-3 at 4.) Dr. Bioh diagnosed Cook with abnormal weight loss.  (*Id.*)  He ordered laboratory tests to identify gastrointestinal diseases. (*Id.*)

On September 19, 2008, Cook reported a mild  upper respiratory infection, improved malaise and fatigue symptoms, abdominal and dyspepsia symptoms, watery bowel movements,

4

nausea and vomiting.  (Doc. No. 8-3 at 5.)  Dr. Bioh diagnosed Cook with GERD (acid reflux).[3]

(*Id.*)

On December 31, 2008, Dr. Bioh observed fever symptoms including a sore throat and

cough producing sputum. (Doc. No. 8-3 at 6.)  Dr. Bioh diagnosed Cook with pharyngitis[4] and

GERD and prescribed Z-Pak and Nexium. (*Id.*)

On February 17, 2009, Cook complained of sudden onset abdominal pain,

lightheadedness, fever, and watery stools.  (Doc. No. 8-3 at 7.)  Dr. Bioh diagnosed Cook with

GERD and continued prescribing Nexium.  (*Id.*)

On April 21, 2009, Cook complained of a sore throat, difficulty swallowing, and pain

while eating.  (Doc. No. 8-3 at 8.)  Dr. Bioh diagnosed Cook with thrush and leukopenia[5] and he

prescribed Diflucan. (*Id.*)  He also ordered a second HIV test "for confirmation." (*Id.*)

On May 15, 2009, Cook complained of poor appetite, variable weight, shortness of

breath, and palpitations.  (Doc. No. 8-3 at 9.)  He weighed 146 pounds with his clothes on.  (*Id.*)

Dr. Bioh diagnosed Cook with leukopenia and GERD and called for more laboratory tests to

check Cook's T-cell count and viral load.  (*Id.*)

On May 21, 2009, Cook complained of poor appetite, chest pains, and diarrhea and

weighed 140 pounds.  (Doc. No. 8-3 at 10.)  Dr. Bioh diagnosed Cook with HIV/AIDS for the

first time.  (*Id.*)  He prescribed azithromycin.  (*Id.*)

---

[3] Gastroesophageal reflux disease (GERD) is a common condition in which the gastric contents move up into the esophagus. The reflux becomes a disease when it causes frequent or severe symptoms or injury. Johns Hopkins Medicine, *Gastroesophageal Reflux Disease (GERD)*, Health Library (Aug. 5, 2015), http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/digestive_disorders/gastroesophageal_reflux_diseas e_gerd_22,gastroesophagealrefluxdiseasegerd/.

[4] Pharyngitis is a throat infection causing inflammation. Viruses, including HIV, are the most common cause of pharyngitis. Johns Hopkins Medicine, *Pharyngitis and Tonsillitis*, Health Library (Aug. 5, 2015), http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/respiratory_disorders/pharyngitis_and_tonsillitis_85, p01320/.

[5] A low white blood cell count, or leukopenia, is a decrease in disease-fighting cells (leukocytes) circulating in one's blood. Mayo Clinic, *Low White Blood Cell Count*, Symptoms (Aug. 5, 2015), http://www.mayoclinic.org/symptoms/low-white-blood-cell-count/basics/definition/sym-20050615.

Cook visited Dr. Bioh on June 1, June 3, and June 10, 2009.  (Doc. No. 8-3 at 11-13.)  At

these visits, Dr. Bioh diagnosed Cook with HIV, thrush (candidiasis),[6] and neutropenia.[7]  (*Id.* at

11-13.)

On July 8, 2009, Dr. Bioh completed Form SSA-4814-F5, "Medical Report on Adult

with Allegation of Human Immunodeficiency Virus (HIV) Infection."  (Doc. No. 8-2 at 2.)  Dr.

Bioh diagnosed Cook with HIV as confirmed by laboratory testing and reported candidiasis and

HIV wasting syndrome.[8]  (*Id.* at 3.)  Dr. Bioh also found blood-related abnormalities of anemia[9]

and granulocytopenia.[10]  (*Id.* at 3.)

Cook visited Dr. Bioh on July 16, 2009, complaining of diarrhea for two days, watery

stools, chest pains, and variable appetite.  (Doc. No. 8-3 at 14.)  Dr. Bioh diagnosed Cook with

diarrhea, irritable bowel syndrome (IBS),[11] and HIV.  (*Id.*)

---

[6] Thrush, or oral candidiasis, is a fungal infection that causes a thick white layer to form on the tongue or inner cheeks. Johns Hopkins Medicine, *HIV/AIDS and Skin Conditions*, Health Library (Aug. 5, 2015),
http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/infectious_diseases/hivaids_and_skin_conditions_13 4,100/.

[7] Neutropenia is an abnormally low count of neutrophils, a type of white blood cell that helps fight off infections, particularly those caused by bacteria and fungi. Mayo Clinic, *Neutropenia (Low Neutrophil Count)* (Aug. 5, 2015), http://www.mayoclinic.org/symptoms/neutropenia/basics/definition/sym-20050854.

[8] HIV wasting syndrome is a disease often marked by weight loss, ongoing fever, diarrhea, and malnutrition. Johns Hopkins Medicine, *Preventing Opportunistic Infections in HIV/AIDS*, Health Library (Aug. 5, 2015),
http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/infectious_diseases/preventing_opportunistic_infecti ons_in_hivaids_134,98/.

[9] Anemia is a common blood disorder that occurs when there are fewer red blood cells than normal, or there is a low concentration of hemoglobin in the blood. Johns Hopkins Medicine, *Overview of Anemia*, Health Library (Aug. 5, 2015),
http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/hematology_and_blood_disorders/overview_of_ane mia_85,p00078/.

[10] Granulocytopenia is a marked decrease in the number of granulocytes. Granulocytes are a type of white blood cell filled with microscopic granules that are little sacs containing enzymes that digest microorganisms.
MedicineNet.com, *Definition of Granulocytopenia* (Aug. 5, 2015),
http://www.medicinenet.com/script/main/art.asp?articlekey=8817.

[11] Irritable bowel syndrome is a common condition characterized by abdominal discomfort associated with altered bowel movements. Johns Hopkins Medicine, *Irritable Bowel Syndrome IBS*, Health Library (Aug. 5, 2015),
http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/digestive_disorders/irritable_bowel_syndrome_ibs_ 22,irritablebowelsyndromeibs/.

On July 21, 2009, Cook reported improved gastrointestinal symptoms, variable activity,

malaise and fatigue, and persistent insomnia. (Doc. No. 8-3 at 15.) Dr. Bioh diagnosed Cook

with HIV, insomnia, and dyspepsia. (*Id.*)

On August 12, 2009, Cook had no new complaints. (Doc. No. 8-3 at 16.) Dr. Bioh

diagnosed edema[12] and synovitis.[13] Dr. Bioh ordered laboratory testing to check Cook's T-cell

count and viral load and noted that he would be monitoring Cook's weight. (*Id.*)

In a letter dated September 24, 2009, Dr. Bioh testified that he diagnosed Cook with

HIV/AIDS in May 2009. (Doc. No. 8-2 at 31.) Cook's condition caused him to suffer severe

neutropenia, anemia, HIV wasting syndrome, and thrush. (*Id.*) He was also receiving treatment

for unrelated conditions: irritable bowel syndrome (IBS) and GERD.[14] (*Id.*) Dr. Bioh stated:

"Due to the unpredictable nature of his conditions, I believe that it would be difficult for Mr.

Cook to be gainfully employed due to his physical status as well as his immunocompromised

state." (*Id.*) He recommended twelve to eighteen months of uninterrupted care so that Cook

might work after that time, but was unable to project a speedy recovery time. (*Id.*)

On October 13, 2009, Cook reported intermittent chest pains, dysphagia,[15] and dyspepsia.

(Doc. No. 8-3 at 20.) Dr. Bioh diagnosed Cook with atypical chest pain and HIV. (*Id.*)

---

[12] Edema is swelling caused by excess fluid trapped in one's body's tissues. Edema can affect any part of your body, but it most commonly occurs in the hands, arms, feet, ankles and legs. Mayo Clinic, *Edema*, Diseases and Conditions (Aug. 5, 2015), http://www.mayoclinic.org/diseases-conditions/edema/basics/definition/con-20033037.
[13] Synovitis refers to inflammation of the synovial membrane, the tissue that lines and protects the joint. Johns Hopkins Medicine, *Glossary - Bone Disorders*, Health Library (Aug. 5, 2015), http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/bone_disorders/glossary_-bone_disorders_85,p00119/.
[14] Gastroesophageal reflux disease (GERD) is a common condition in which the gastric contents move up into the esophagus. The reflux becomes a disease when it causes frequent or severe symptoms or injury. Johns Hopkins Medicine, *Gastroesophageal Reflux Disease (GERD)*, Health Library (Aug. 5, 2015), http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/digestive_disorders/gastroesophageal_reflux_disease_gerd_22,gastroesophagealrefluxdiseasegerd/.
[15] Dysphagia refers to problems with swallowing. Johns Hopkins Medicine, *Dysphagia (Swallowing Disorders)*, Health Library (Aug. 5, 2015), http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/otolaryngology/dysphagia_swallowing_disorders_22,dysphagia/.

On November 3, 2009, Cook complained of a persistent rash in his groin. (Doc. No. 8-3 at 22.) Dr. Bioh diagnosed Cook with HIV and dermatitis.[16] (*Id.*)

On November 10, 2009, Cook had reported upper respiratory symptoms, nausea, vomiting, and diarrhea. (Doc. No. 8-3 at 21.) Dr. Bioh diagnosed Cook with HIV and a viral upper respiratory infection. (*Id.*)

On November 20, 2009, Dr. Bioh completed a "Multiple Impairment Questionnaire," a standardized, non-SSA medical form. (Doc. No. 8-2 at 20.) He diagnosed Cook with HIV/AIDS and gave a "fair to guarded" prognosis. (*Id.*) His clinical findings included a T-cell count of less than ten, a viral load in excess of 200,000, positive HIV antibodies, abnormal weight loss, and malaise and fatigue. (*Id.* at 20-21.) Dr. Bioh diagnosed Cook's primary symptoms as "malaise/fatigue, poor appetite, nausea, abdominal pain," and a "depressed mood." (*Id.* at 21.) Dr. Bioh observed low levels of pain and rated Cook's fatigue at nine out of ten: "severe." (*Id.* at 22.)

Dr. Bioh believed Cook was able to sit for eight hours in a day and stand or walk for one hour total in an eight-hour workday so long as he could move around every thirty minutes and not sit again for five minutes. (*Id.* at 22-23.) . (Doc. No. 8-2 at 22.) In addition, "hourly" breaks of ten to fifteen minutes each were necessary. (*Id.* at 25.) Dr. Bioh found that Cook had minimal problems with handling, reaching, or manipulating. (*Id.* at 24.) He could frequently lift five pounds and occasionally ten pounds, but nothing heavier. (*Id.* at 23.)

Cook's decreased immunity and resulting proneness to infection would last at least twelve months and increase if he were placed in a competitive work environment. (*Id.* at 24-25.) He would have to miss work more than three times a month, and his symptoms would interfere

---

[16] Dermatitis is an inflammation of the skin. Johns Hopkins Medicine, *Dermatitis*, Health Library (Aug. 5, 2015), http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/dermatology/dermatitis_85,p00274/.

with his concentration. (*Id.* at 25-26.) He would be incapable of handling even low stress work because of his mood and fatigue. (*Id.*) In addition, Cook would need a job requiring easy access to a restroom for his gastrointestinal issues. (*Id.*)

On December 4, 2009, Cook reported rashes on his genitals and buttocks. (Doc. No. 8-3 at 23.) Dr. Bioh diagnosed Cook with HIV and GERD. (*Id.*) On January 5, 2010, Cook complained of atypical chest pain, as well as diarrhea. (*Id.* at 24.) Dr. Bioh diagnosed Cook with dyspepsia and GERD. (*Id.*) On February 2, 2010, Cook complained of diarrhea and chest palpitations.

On March 3, 2010, Dr. Bioh diagnosed Cook with HIV and GERD. (Doc. No. 8-3 at 26.) On April 6, 2010, Dr. Bioh diagnosed Cook with groin furuncles[17] and carbuncles.[18] (*Id.* at 27.) On June 8, 2010, Cook complained of swelling in his finger for the last several days. (*Id.* at 30.) Dr. Bioh diagnosed paronychia[19] and HIV. (*Id.*) He performed "drainage of purulent material" on Cook's thumb. (*Id.*) On July 13, 2010, Cook reported a rash. (*Id.* at 32.) Dr. Bioh diagnosed Cook with dermatitis. (*Id.*) On September 7, 2010, Cook reported blurry vision and headaches. (Doc. No. 8-3, at 33.)

In a second letter dated March 8, 2011, Dr. Bioh provided an update on Cook's health. stating that Cook continued to experience HIV-related malaise, fatigue, and stomach problems.

---

[17] A furuncle, or boil, is an infection affecting groups of hair follicles and nearby skin tissue. *Staphylococcus aureus* is the most common bacteria to cause these infections. U.S. National Library of Medicine, *Boils*, Medical Encyclopedia (Aug. 5, 2015), http://www.nlm.nih.gov/medlineplus/ency/article/001474.htm.

[18] Carbuncles are clusters of boils that are usually found on the back of the neck or thigh. *Staphylococcus aureus* is the most common bacteria to cause these infections. Johns Hopkins Medicine, *Folliculitis, Boils, and Carbuncles*, Health Library (Aug. 5, 2015),
http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/dermatology/folliculitis_boils_and_carbuncles_85,p00285/.

[19] Paronychia is a skin infection around a finger or toenail. Johns Hopkins Medicine, *Glossary – Dermatology*, Health Library (Aug. 5, 2015),
http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/dermatology/glossary_-_dermatology_85,P00288/.

(Doc. No. 8-3 at 3.) Dr. Bioh's prognosis "remain[ed] guarded;" he found Cook still "disabled" and "unable to be gainfully employed" because of his persistent symptoms. (*Id.*)

### b.    Brian Hamway, M.D.: SSA Consultative Examiner

Cook met with Dr. Hamway at the request of the Social Security Administration on August 5, 2009. (Doc. No. 8-2 at 12.) Dr. Hamway noted that Cook was diagnosed "three months ago" in May, 2009, and that Cook did not know his T-cell count or viral load. (*Id.*) He further noted that Cook had no HIV-related hospitalizations. (*Id.*) Cook told Dr. Hamway that he had thrush, diarrhea, weakness, and weight loss. (*Id.*) At the time, he was taking Kaletra, Truvada, Dapsone, and Zithromax. (*Id.*) Dr. Hamway weighed Cook at 133 pounds and wrote that he was "thin." (*Id.* at 13.) He found his gait to be "mildly antalgic."[20] (*Id.* at 13.) He found full dexterity and no chest or heart abnormalities. (*Id.* at 14.) Dr. Hamway noted that Cook's tongue was white but was unsure if it was thrush. (*Id.* at 13.) Dr. Hamway diagnosed Cook HIV-positive by history with "no evidence of this during evaluation." (*Id.* at 14.) Dr. Hamway concluded that Cook had no limitations based on the medical evaluation done that day. (*Id.* at 15.)

### 3.    ALJ Decision

By decision dated April 28, 2011, ALJ Dorf found Cook disabled between August 1, 2008, and August 5, 2009, but medically improved and no longer disabled as of August 6, 2009. (Doc. No. 8 at 63.) At the first step, the ALJ found that Cook had not engaged in substantial gainful activity since August 1, 2008, the HIV onset date. (*Id.* at 67.) At the second step, the ALJ found that "at all times relevant to the decision," Cook had severe impairments of HIV, fatigue, and weight loss. (*Id.*) At the third step, the ALJ held that between August 1, 2008 and

---

[20] Antalgic (painful) gait occurs when the patient attempts to avoid putting weight on one leg due to pain. FootVitals.com, *Antalgic Gait* (Aug. 5, 2015), http://www.footvitals.com/health/antalgic-gait.html.

August 5, 2009, Cook did not have any impairment that met or equaled the impairments listed in the Regulations. (*Id.*) At the fourth step, between August 1, 2008, and August 5, 2009, the ALJ held that Cook had the residual functional capacity ("RFC") to perform less than a full range of sedentary work because he was unable to sit for six hours in an eight-hour workday. (*Id.*) At the last step, the ALJ found that Cook could not perform his past work. (*Id.* at 70.) In addition, given his residual functional capacity, the ALJ found that there were no other jobs in the economy Cook could perform. (*Id.* at 70-71.) As a result, the ALJ concluded that Cook was disabled between August 1, 2008 and August 5, 2009. (*Id.* at 71.)

Next, the ALJ found Cook medically improved as of August 6, 2009, the date after Cook's consultation with Dr. Hamway. (Doc. No. 8 at 71.) He found Dr. Hamway's assessment of "no limitation" consistent with Dr. Bioh's contemporaneous findings. (*Id.*) The ALJ found that Cook had the RFC to perform the full range of sedentary work (*Id.*). Based on this second RFC, the ALJ found that Mr. Cook could not perform past work but found that he could perform a significant number of jobs in the national economy. (*Id.* at 72.) He did not specify which jobs Cook could do. Based on Cook's age, education, and work experience, the ALJ found Cook "not disabled" under Medical-Vocational Guidelines Rule 201.27 after August 6, 2009. (*Id.* at 72-73.)

## C. Appeals Council Review

Cook appealed the ALJ's decision to the Appeals Council on May 20, 2011. (Doc. No. 8 at 52.) On September 25, 2012, the Appeals Council denied Cook's request. (*Id.* at 5.)

## III.   DISCUSSION

### A.   Standard of Review

On judicial review, "[t]he of findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3).

Therefore, a court does not review *de novo* whether a claimant is disabled. *See Brault v. Soc.*

*Sec. Admin. Comm'r*, 683 F .3d 443, 447 (2d Cir. 2012) (*per curiam*) (citing *Pratts v. Chater*, 94

F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n. 21 (1976) (citing

42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*,

817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner

applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*,

167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at

447. Second, the court must decide whether substantial evidence in the Record supports the

Commissioner's decision. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of

these requirements, the reviewing court must affirm; if not, the court may modify or reverse the

Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided

that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d

183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). This

applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social

Security Ruling ("SSR"). *See, e.g.*, *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)

(regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the

court may remand the matter to the Commissioner under 42 U.S.C. § 405(g), especially if

necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *See Crysler*

*v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if there is substantial evidence for the plaintiff's position, a court must uphold the ALJ's decision if there is substantial evidence to support the defendant's position. *See Yancy v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). The substantial evidence standard means that once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448.

To be supported by substantial evidence, the ALJ must base his decision on consideration of "all evidence available in [the claimant's] case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3) (H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[ ] every item of testimony presented" or "reconcile explicitly every conflicting shred of medical testimony," the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (*per curiam*); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010); *see Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d

Cir.2008) (overlooking and mischaracterizing evidence).  The ALJ must avoid rote analysis and

conclusory explanations; he must discuss "the crucial factors in any determination . . . with

sufficient specificity to enable the reviewing court to decide whether the determination is

supported by substantial evidence."  Calzada v. Astrue, 753 F. Supp. 2d 250, 269 (S.D.N.Y.

2010).

When parties submit "new and material evidence," the Appeals Council may consider the

additional evidence "only where it relates to the period on or before the date of the administrative

law judge hearing decision."  20 C.F.R. § 404.970(b).  "New evidence" refers to "any evidence

that has not been considered previously during the administrative process."  Shrack v. Astrue,

608 F. Supp. 2d 297, 302 (D. Conn. 2009).

## B.    Legal Standards for Determining Disability

Under the Act, every individual considered to have a "disability" is entitled to disability

insurance benefits.  42 U.S.C. § 423(a)(1).  The Act defines "disability" as an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1)(A),

423(d)(1)(A), 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1505, 416.905.  A claimant's

impairments must be "of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); see also 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the

Commissioner is required to conduct the following five-step inquiry: (1) determine whether the

claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the Regulations—if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the residual functional capacity ("RFC") to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520, 416.920; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5). A claimant's RFC is "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* SSR 96–9p, 1996 WL 374185 (July 2, 1996) (clarifying that a claimant's RFC is his maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments,

symptoms, physical limitations, and difficulty performing daily activities. *Genier v. Astrue*, 606

F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§

404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes

of steps two, three, and four, the ALJ must follow a two-step process, first determining whether

the claimant has a "medically determinable impairment that could reasonably be expected to

produce [his alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at

49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so

that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20

C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c). The ALJ has "discretion in weighing the

credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d

at 49; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be

"consistent" with medical and other evidence). In determining whether there is any other work

the claimant can perform, the Commissioner has the burden of showing that "there is other

gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*,

142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

## C.    Medical Improvement Standard

The Social Security Act states:

A recipient of benefits ... may be determined not to be entitled to such benefits on
the basis of a finding that the physical or mental impairment on the basis of which
such benefits are provided has ceased, does not exist, or is not disabling only if
such finding is supported by—
    (1) substantial evidence which demonstrates that—
        (A) there has been any medical improvement in the individual's impairment
        or combination of impairments (other than medical improvement which is
        not related to the individual's ability to work), and
        (B) the individual is now able to engage in substantial gainful activity . . .

42 U.S.C. § 423(f).

Once a claimant establishes the existence of a disabling condition, the medical improvement standard shifts the burden of proof to the Commissioner; a claimant is entitled to a presumption that the classification will not change unless the condition, governing statutes, or regulations change. *De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984); *see also Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) ("[U]nder the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled."). Where a claimant has already demonstrated a past disabling condition, the ALJ must determine whether the condition has improved, and if so, whether that improvement is relevant to the claimant's work capacity. 20 C.F.R. § 404.1594(a). Even where such improvement is related to the claimant's ability to work, the Commissioner must also show that the claimant is able to engage in substantial gainful activity. 20 C.F.R. § 404.1594(b)(3). The regulations define medical improvement as any decrease in the medical severity of a claimant's impairment which was present at the time of the most recent favorable medical decision that he or she was disabled or continues to be disabled. 20 C.F.R. § 404.1594(b)(1). The ALJ must base his determination that there has been a decrease in medical severity on improvement in the symptoms, signs, or laboratory findings associated with a claimant's impairments. *Id.*

Generally, the medical improvement standard under 20 C.F.R. § 404.1594 applies to continuing disability reviews regarding a prior adjudication. *See, e.g., Veino v. Barnhart*, 312 F.3d 578 (2d Cir. 2002). While the Second Circuit has not yet addressed whether the medical improvement standard also applies to closed period cases, other circuits have held that the standard also applies in those cases. *See, e.g.*, *Waters*, 276 F.3d at 719; *Shepherd v. Apfel*, 184 F.3d 1196, 1200 (10th Cir. 1999); *Jones v. Shalala*, 10 F.3d 522 (7th Cir. 1993); *Chrupcala v.*

17

*Heckler*, 829 F.2d 1269, 1274 (3d Cir. 1987); *Pickett v. Bowen*, 833 F.2d 288, 292–93 (11th Cir. 1987). Moreover, neither party contests that the standard governs this case. The Court finds that this approach is correct.

The ALJ must assess medical improvement in relation to the "most recent favorable medical decision[,]" defined as "the latest decision involving a consideration of the medical evidence and the issue of whether [a claimant was] disabled or continued to be disabled which became final." 20 C.F.R. § 404.1594(b)(7). Some courts have used the onset date of the disability as the appropriate point of comparison in closed period disability cases. *See, e.g.*, *Pickett v. Bowen*, 833 F.2d 288, 291-92 (11th Cir. 1987) (finding that the 1984 Amendments to 42 U.S.C. § 423 direct the ALJ to use the onset of disability as benchmark for medical improvement). Other courts have used the end date of the closed period as the point of comparison. *See, e.g., Jones v. Shalala*, 10 F.3d 522 (7th Cir. 1993) (applying the medical improvement standard to a closed period of disability).

Although neither precedent is binding in this District, the Court finds that the reasoning in *Pickett*—grounded in the amending statute—is the most persuasive. There, the court rejected the Secretary's argument that medical improvement actions under § 2(d)(6) of the 1984 Disability Reform Act required: (1) an earlier and a later decision; and (2) that the action raises the issue of the propriety of the second decision terminating benefits. *See Pickett v. Bowen*, 833 F.2d 288, 291 (11th Cir. 1987). Congress intended a broad remedial policy when it enacted the 1984 amendment. *See id.* at 292. Specifically,

> The overall purpose of the bill is, first, to clarify statutory guidelines for the determination process to insure that no beneficiary loses eligibility for benefits as a result of careless or arbitrary decision-making by the Federal government. Second, the bill is intended to provide a more humane and understandable application and appeal process for disability applicants and beneficiaries appealing termination of their benefits.

*Id.* (citing H.R. Rep. 98-618, at 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3038, 3039). "A more humane" application of the appeals process required rejection of the Secretary's narrow statutory reading. *Id.* at 291. The ALJ in *Pickett* thus examined the claimant's disability at its onset when he determined his disability to have ceased due to medical improvement. *See id.* at 291-92.

**D.      The Eight–Step Sequential Evaluation**

The medical improvement standard comprises eight steps set forth in 20 C.F.R. § 404.1594 for SSD and seven steps in 20 C.F.R. § 416.994 for SSI. These steps are completed "[t]o assure that disability reviews are carried out in a uniform manner . . . and that any decisions to stop disability benefits are made objectively, neutrally and are fully documented." 20 C.F.R. §§ 404.1594(f), 416.994(b)(5).

In an SSD medical improvement review, the SSA begins at Step One and asks whether the claimant is "engaging in substantial gainful activity." 20 C.F.R. § 404.1594(f)(1). If the claimant is so engaged, the ALJ must find disability "to have ended." *Id.* If not, the analysis proceeds to Step Two. In an SSI review, the process begins with Step Two. 20 C.F.R. § 416.994(b)(5).

Step Two asks whether the claimant has "an impairment or combination of impairments" that "meets or equals the severity of an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1594(f)(2), 416.994(b)(5)(i). If the claimant's impairment(s) meets the listed impairment(s), the claimant's disability is "found to continue" and the analysis ends. 20 C.F.R. §§ 404.1594(f)(2), 416.994(b)(5)(i).

If, however, the claimant does not have such listed impairment, Step Three asks if there has been medical improvement as defined in the regulations. 20 C.F.R. §§ 404.1594(f)(3), 416.994(b)(5)(ii).

If the claimant has medically improved, at Step Four, the ALJ must determine whether the improvement is related to his or her ability to work under the regulations. 20 C.F.R. §§ 404.1594(f)(4), 416.994(b)(5)(iii).

If there is no medical improvement in Step Three or the medical improvement is not related to work ability in Step Four, at Step Five, the ALJ must consider whether any of the medical improvement exceptions apply. 20 C.F.R. §§ 404.1594(f)(5), 416.994(b)(5)(iv).

At Step Six, the ALJ determines whether all the claimant's impairments in combination are severe. 20 C.F.R. §§ 404.1594(f)(6), 416.994(b)(5)(v). If the combined impairments do not significantly limit the claimant's ability to work, the claimant will no longer be disabled. 20 C.F.R. §§ 404.1594(f)(6), 416.994(b)(5)(v).

At Step Seven, the ALJ assesses the claimant's RFC based on all current impairments. 20 C.F.R. §§ 404.1594(f)(7), 416.994(b)(5)(vi). He then considers whether the claimant can do past work. 20 C.F.R. §§ 404.1594(f)(2), 416.994(b)(5)(i). If so, the ALJ finds the disability period to have ended.

Finally, at Step Eight, if the claimant cannot do past work, the ALJ considers whether claimant can do other work given the claimant's RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1594(f)(8), 416.994(b)(5)(vii). If so, the period of disability ends. If not, the disability period continues. 20 C.F.R. §§ 404.1594(f)(8), 416.994(b)(5)(vii).

The Court finds that it was appropriate for ALJ Dorf to use the eight-step process in applying the medical improvement standard but that, for the reasons below, he erred in finding Cook able to do other work based on the opinion of Dr. Hamway.

### E.    The Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion deserves "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

The ALJ must explicitly consider various factors to determine how much weight to give to the opinion of a treating physician. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (c)(3–6).

The ALJ is required to explain the weight given to the treating physician's opinion. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran*, 362 F.3d at 32 ("[W]e will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are

conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx.

197, 199 (2d Cir. 2010) (finding reversible error where an ALJ failed to explain his

determination not to credit the treating physician's opinion). The ALJ is not permitted to

arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion.

*Balsamo*, 142 F.3d at 81.

**F.      The ALJ erred in his decision by failing to apply the Treating Physician Rule.**

**1.      The ALJ failed to give the treating physician's findings controlling weight.**

The ALJ failed to show why Dr. Bioh's findings were not given controlling weight.

Although the ALJ detailed Dr. Bioh's history with Cook, he did not explain the weight given to

Dr. Bioh's opinion. (Doc. No. 8 at 67-71.) As stated above, there are five factors the ALJ must

explicitly consider when weighing the treating physician's evidence. *See Halloran v. Barnhart*,

362 F.3d at 32. Buried within the opinion, the ALJ wrote: "The undersigned has also considered

opinion evidence in accordance with the requirements" of the regulations. (Doc. No. 8 at 71-72.)

This sentence alone, without more, does not clarify what legal standard the ALJ applied and

gives cause for remand. *See Schaal*, 134 F.3d at 503; 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for

the weight we give your treating source's opinion.").

The ALJ's statement fails to say what weight, if any, he gave to Dr. Bioh's opinion. It

does not acknowledge that Dr. Bioh had seen Cook on at least twenty-five occasions since

August 2008 or that clinical and laboratory testing supported Dr. Bioh's findings. (Doc. No. 8-3

at 4-33; Doc. No. 8-2 at 2.) In addition, the ALJ's statement says nothing about Dr. Bioh's

findings in his letters dated two years apart. The first letter states that Cook would need twelve

to eighteen months of medical care. (Doc. No. 8-2 at 31.) The most recent letter, dated March 8,

2011, finds that Cook's symptoms have persisted and that his prognosis is "guarded." (Doc. No. 8-3 at 3.) Moreover, the ALJ's sentence says nothing about the consistency of Dr. Bioh's opinion with the rest of the record, nothing about Dr. Bioh's training as an internist, and nothing about any other factors the ALJ considered. For failing to explain why the ALJ did not credit Dr. Bioh, the Court finds cause for remand. *Schaal v. Apfel*, 134 F.3d at 505.

### 2.    The ALJ gave more than limited weight to an SSA consultative examiner.

The ALJ gave great weight to Dr. Hamway, a one-time consultative examiner. While the ALJ did not state explicitly the weight he gave to Dr. Hamway's opinion, he did find medical improvement after August 6, 2009, the day after Cook's visit to Dr. Hamway. (Doc. No. 8 at 71.) The ALJ does not provide "good reasons" for conferring great weight to this consultative physician's opinion. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).

In determining whether a claimant has a disability, "a consulting physician's opinions or report should be given limited weight." *Cruz v. Sullivan,* 912 F.2d 8, 12 (2d Cir. 1990). As the treating physician, Dr. Bioh is "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In contrast, "consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz*, 912 F.2d at 13. Dr. Hamway did not have Cook's medical history available on August 5, 2009. (Doc. No. 8-2 at 12, 14.) He did not even know Cook's T-cell count and viral load, barometers of a patient's HIV severity. (*Id.* at 12.) Such a dearth of information cannot provide the longitudinal picture of a claimant's impairments the regulations require. Especially compared to Dr. Bioh's treatment record, Dr. Hamway's report should not have received

23

controlling weight. Given the lack of information, the ALJ erred in using Dr. Hamway's report as proof that Cook had medically improved.

### 3.    The ALJ overlooked and mischaracterized opinion evidence.

The record does not contain substantial evidence supporting the ALJ's finding that Cook had improved medically after August 6, 2009. In an attempt to reconcile Dr. Bioh's findings with Dr. Hamway's statements, the ALJ: (1) overlooked Dr. Bioh's March 2011 report finding Cook's prognosis to be guarded, and (2) mischaracterized Dr. Bioh's treatment notes to find Cook not disabled. The ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–84 (2d Cir. 2009).

First, the ALJ overlooked Dr. Bioh's letter dated March 8, 2011. Twice during the hearing, the ALJ asked for, and received confirmation of, an "additional" "medical record." (Doc. No. 8 at 32, 37.) The findings in the additional letter appear nowhere in the ALJ's decision. This factual oversight casts doubt on the substance of the ALJ's finding because the evidence in the letter is more favorable to Cook than the evidence the ALJ used in the decision. The letter states that Cook "has continued to experience bouts of malaise/fatigue, weakness, poor appetite, depressed mood, and intermittent abdominal symptoms." (Doc. No. 8-3 at 3.) This contrasts with Dr. Hamway's August 5, 2009 report finding normal bowel movements, full muscle strength, and no abdominal irregularities. (Doc. No. 8-2 at 14.) More importantly, the letter states that Cook is disabled, that his HIV prognosis is "guarded," and that he requires regular monitoring. (Doc. No. 8-3 at 3.) A treating physician's own determination of disability is not dispositive of the issue, *see Gilbert v. Apfel*, 70 F. Supp. 2d 285, 291 (W.D.N.Y. 1999), but Dr. Bioh's letter expands on the trajectory of Cook's ailments, reveals continuing sickness, and predicts further inability to work. Placed alongside Dr. Hamway's report, there are clear

discrepancies that the ALJ was required to consider and discuss before finding Cook medically improved.

Second, the ALJ mischaracterized Dr. Bioh's treatment notes. The ALJ referred to several of Dr. Bioh's notes stating "no new complaints," implying that Cook had no impairments.[21] (Doc. No. 8 at 68-69) (citing Doc. No. 8-3 at 16, 18, 19, 20.) For example, on August 12, 2009, although Cook had "no new complaints," Dr. Bioh noted that Cook suffered from edema and synovitis. (Doc. No. 8-3 at 16.) In fact, on the dates that the ALJ referenced no new complaints, Cook always had edema (swelling of the limbs) and synovitis (joint inflammation). (*Id.* at 18, 19, 20.) That Cook did not affirmatively complain about these symptoms does not mean he had no impairments at the time.

Third, after August 12, 2009, there were in fact new complaints. For example, on November 10, 2009, Cook complained of upper respiratory infections, similar to those in September 2008. (*Id.* at 21.) In September 2010, Cook complained of blurry vision and intermittent headaches for the first time. (*Id.* at 33.) The ALJ's finding that Dr. Hamway's assessment was consistent with Dr. Bioh's findings mischaracterizes Dr. Bioh's evidence because there were new complaints and diagnoses. Furthermore, these new complaints and diagnoses undercut the ALJ's determination that there was "marked" medical improvement. (Doc. No. 8 at 71.) To "mischaracterize relevant medical evidence" in this way, interpreting Cook's condition to be good, "when the term ['no new evidence'] could only mean that [Cook's] condition has not changed," has been a sufficient ground for remand. *Kohler v. Astrue*, 546 F.3d 260, 268-69 (2d Cir. 2008). Such error requires a remand for consideration of the improperly

---

[21] The cited medical evidence at pages 16, 18, 19, and 20 refer to Cook's visits on August 12, 2009, September 2, 2009, September 17, 2009, and October 13, 2009, respectively.

excluded evidence, at least where "the unconsidered evidence is significantly more favorable to

the claimant than the evidence considered." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

### 4.    The ALJ improperly applied the Medical-Vocational Guidelines.

Finally, the ALJ erred in applying the Medical-Vocational Guidelines ("the Grids").

Cook has significant nonexertional impairments that limit the range of work he can perform.  In

addition, the ALJ did not introduce a vocational expert who could testify on the range of jobs

Cook could perform.  When a claimant's nonexertional impairments are significantly limiting,

the ALJ cannot automatically apply the Grids without consulting a vocational expert. *Rosa v.*

*Callahan*, 168 F.3d 72, 78 (2d Cir. 1999).  Failure to consult in that situation warrants remand

for introduction of expert vocational testimony.

### a.    Applicable Law

The ALJ must conduct a five-step inquiry to determine whether a claimant has a

disability.  20 C.F.R. § 404.1520.  The claimant bears the burden of proof as to the first four

steps of the analysis, while the Commissioner has the burden of proving the fifth step. *Berry v.*

*Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  In most circumstances, the Commissioner is able

to meet his burden at step five by relying on the Grids in 20 C.F.R. Part 404, Subpart P,

Appendix 2 to show that the claimant can perform alternate substantial gainful work.

Nevertheless, if a claimant's nonexertional impairments "'significantly limit the range of work

permitted by his exertional limitations' . . . the application of the grids is inappropriate" and a

vocational expert is required. *Bapp v. Bowen*, 802 F.2d 605, 606 (2d Cir. 1986).  A

nonexertional impairment "significantly diminish[es]" a claimant's range of employment if it is

non-negligible. *Bapp*, 802 F.2d at 605–06.  A nonexertional impairment is non-negligible when

it "so narrows a claimant's possible range of work as to deprive him of a meaningful employment

opportunity." *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) (quoting *Zabala v. Astrue*, 595 F.3d at 411 (2d Cir. 2010)).

### b.     The ALJ improperly assessed Cook's credibility based on his new RFC.

#### (1)     The ALJ erred in his credibility analysis.

An ALJ must consider subjective evidence of disability, but he "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (*per curiam*) (citations omitted).  A "finding that the witness is not credible must. . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)).  Most importantly, the regulations require ALJs to compare the claimant's statements with the medical evidence on record and *then* determine whether the symptoms "affect [one's] capacity to perform basic work activities."  20 C.F.R. § 404.1529(c)(4).

The ALJ in this case concluded, without more, that: "[Cook's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible beginning on August 6, 2009, to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below."  (Doc. No. 8 at 71.)  The ALJ offered no reasons for finding Cook not credible.  As a result, this Court cannot intelligibly review the record to see whether substantial evidence supports the ALJ's finding.  *See Williams*, 859 F.2d at 260-61 (2d Cir. 1988).

**(2)** **The ALJ used a predetermined RFC to evaluate Cook's credibility as to his own symptoms instead of evaluating Cook's credibility first.**

An ALJ must consider a claimant's "statements about the intensity, persistence, and limiting effects of [his] symptoms . . . in relation to the *objective medical evidence*." 20 C.F.R. § 404.1529(d) (emphasis added). Here, the ALJ compared Cook's statements to his RFC as determined by the ALJ. This is not what the regulations say and is logically backwards. The ALJ should first consider the claimant's statements and the objective medical evidence to determine the RFC. Thus, the credibility evaluation should be made to help the ALJ identify the RFC. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) (finding it improper to determine ability to work first and use that to determine claimant's credibility).[22] *See also Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010); *Gonzalez v. Colvin*, No. 14-CV-6206 (SN), 2015 WL 1514972, at *20 (S.D.N.Y. Apr. 1, 2015); *Singleton v. Colvin*, No. 13-CV-4185 (PGG)(FM), 2015 WL 1514612, at *16 (S.D.N.Y. Mar. 31, 2015); *Cahill v. Colvin*, No. 12-CV-9445 (PAE)(MHD), 2014 WL 7392895, at *23 (S.D.N.Y. Dec. 29, 2014); *Emerson v. Comm'r of Soc. Sec.*, No. 12-CV-6451 (PAC)(SN), 2014 WL 1265918, at *17 (S.D.N.Y. Mar. 27, 2014). Moreover, the use of the RFC as a benchmark does not provide the Court the same

---

[22] *Compare Bjornson v. Astrue*, 671 F.3d 640, 644 (7th Cir. 2012) *with* (Doc. No. 8, Dec. at 72.) The *Bjornson* ALJ's decision reads:

> After careful consideration of the evidence, the undersigned [administrative law judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. Bjornson v. Astrue, 671 F.3d 640, 644 (7th Cir. 2012)

Compare with the ALJ's language in this case:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible beginning on August 6, 2009, to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

opportunity for meaningful review as does the "objective medical evidence." *See* SSR 96-7p,
1996 WL 374186, at *6 (July 2, 1996).

           **c.**      **The ALJ failed to introduce a vocational expert.**

      The ALJ concluded that after August 6, 2009, Cook was able to "perform a significant
number of jobs in the national economy" without consulting a vocational expert.  (Doc. No. 8 at
71.)  He found that Cook was unable to perform past relevant work.  (*Id.*)  Although consultation
with a vocational expert is not required in every case, the Grids do not control if there are
significantly limiting nonexertional impairments.  *See Bapp v. Bowen*, 802 F.2d at 604-06, citing
20 C.F.R., Pt. 404, Subpt. P, App. 2 § 200.00(e)(2).

      The opinion and testimony evidence revealed a mix of exertional[23] and nonexertional
limitations.[24]  As to exertional limitations, Cook needed to rest every hour for 10-15 minutes
each workday,  (Doc. No. 8-2 at 22, 25), experienced weakness and fatigue,  (Doc. No. 8 at 17,
25), and had problems sitting because of his gastrointestinal issues.  (*Id.* at 36.)  Cook's
nonexertional limitations included reduced attention and concentration.  (*Id.* at 28.)  He was also
unable to handle low work stress due to his mood and fatigue level.  (Doc. No. 8-2 at 25.)

      This combination of exertional and nonexertional impairments precludes sole reliance on
the Grids.  20 C.F.R. § 404.1569a(d) ("The rules provide a framework to guide our decision.").
*See Selian*, 708 F.3d at 421.  In cases like these, the Second Circuit requires introduction of a
vocational expert.  *See Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).  Remand is therefore

---

[23] The regulations define exertional limitations as "limitations and restrictions imposed by [one's] impairment(s)"
that "affect only [one's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying,
pushing, and pulling)." 20 C.F.R. § 404.1569a(b).
[24] The regulations define nonexertional limitations as "limitations and restrictions imposed by [one's]
impairment(s)" that "affect only [one's] ability to meet the demands of jobs other than the strength demands." 20
C.F.R. § 404.1569a(c). A non-exhaustive list of nonexertional impairments include: (1) anxiety, depression; (2)
attention and concentration issues; (3) difficulty with detailed instructions; and (4) difficulty seeing or hearing. 20
C.F.R. § 404.1569a(c)(1)(i)-(iv).

appropriate here to fill any administrative gaps. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

**5.      The District Court should remand the case for further proceedings.**

Cook requests a remand solely for calculation of benefits, or in the alternative, for the Court to remand the case for reconsideration of the evidence. (Doc. No. 11 at 1; Doc. No. 12 at 17.) A court should order a remand to calculate benefits only where the record contains "persuasive proof of disability" and remand for further evidentiary proceedings would serve no further purpose. *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Remand for further administrative proceedings is appropriate [w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

Here, the ALJ failed to show why Dr. Bioh's findings were not given controlling weight. He also did not state the weight he gave to Dr. Hamway. Next, he overlooked and mischaracterized opinion evidence. Also, the ALJ did not consult a vocational expert in his discussion of the available jobs in the national economy Cook can perform. Last, the ALJ improperly used a predetermined RFC to evaluate Cook's credibility. These errors warrant a remand for further proceedings.

## IV.      CONCLUSION

For the reasons set forth above, I recommend that the Court **GRANT IN PART** Cook's Motion for a Judgment on the Pleadings and **REMAND** for further administrative proceedings.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of

30

the Court and served on all adversaries, with extra copies delivered to the chambers of the

Honorable Thomas P. Griesa, 500 Pearl Street, Room 1630, New York, N.Y. 10007 and to the

chambers of the undersigned, 500 Pearl Strseet, Room 1970, New York, N.Y. 10007. Failure to

file timely objections shall constitute a waiver of those objections in both the District Court and

on later appeal to the United States Court of Appeals. *See* 28 U.S.C. § 636(b)(1) (West Supp.

1995); Fed. R. Civ. P. 72, 6(a), 6(e); *Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of

Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*).

**DATED: August 14, 2015**
**New York, New York**

Respectfully Submitted,

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

31